# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

EUGENE DARIUS MOORE,

Defendant.

Case. No. 25-CR-315 (LMP/JFD)

**REPORT AND RECOMMENDATION**

This case has been referred to the undersigned magistrate judge for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. This matter is before the Court on three pretrial motions by Eugene Darius Moore: A Motion to Suppress Evidence from a warrantless search of Mr. Moore's vehicle (Dkt. No. 20); a Motion to Suppress Evidence from a search, conducted pursuant to warrant, of Mr. Moore's apartment (Dkt. No. 21); and a Motion for Discovery (Dkt. No. 22). Mr. Moore is charged by indictment (Dkt. No. 1) with one count of possession of methamphetamine and fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); two counts of possession of fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i).

1

The Court held a motions hearing on December 22, 2025. Assistant United States Attorney Lauren O. Roso represented the United States,[1] and Attorney Brian N. Toder represented Mr. Moore. (*See* Minute Entry, Dkt. No. 28.) Counsel for the United States submitted seven exhibits, including Surveillance Photographs (Gov. Ex. 1); Certificates Earned by narcotics detection dog Bolo (Gov. Ex. 2); Experience and Reliability Reports for Bolo (Gov. Ex. 3); body-worn camera ("BWC") footage from Minnesota State Trooper Kyle Koeberl (Gov. Ex. 4); the search warrants and accompanying affidavits for Mr. Moore's apartment (Gov. Exs. 5–6); and the warrant and accompanying affidavit for the data and footage related to two video-enabled Ring doorbells at Mr. Moore's apartment (Gov. Ex. 7). Mr. Moore submitted Trooper Koeberl's dash-mounted camera footage (Def. Ex. 1.). The United States called as witnesses Crow Wing County Sheriff's Office Investigator Justin Athman and Minnesota State Trooper Kyle Koeberl. (*See* Hr'g Tr. 2, Dkt. No. 30.) Mr. Moore submitted his post-hearing brief on January 20, 2026 (Dkt. No. 31) and a Notice of Supplemental Authority on February 12, 2026 (Dkt. No. 37.) The United States submitted its post-hearing brief on February 27, 2026 (Dkt. No. 40). Upon receipt of the brief of the United States the Court took the motions under advisement.

The Court recommends denial of Mr. Moore's two motions that seek the suppression of evidence, because it finds that the warrantless search of Mr. Moore's van was justified under the automobile exception to the Fourth Amendment's warrant clause, but even if it was not, Trooper Koeberl acted on the collective knowledge of a law

---

[1] The United States is now represented in this case by AUSA Mary Riverso, who was substituted as counsel for former AUSA Lauren Roso on February 3, 2026.

enforcement investigative team of which the trooper was a member. Mr. Moore challenges the search of his residence because the search warrant application depended upon the discovery of narcotics in the warrantless search of Mr. Moore's van, a search that is challenged in Mr. Moore's first suppression motion. The Court finds that the warranted search of Mr. Moore's apartment was constitutional because, contrary to Mr. Moore's claim that probable cause for the residence search warrant is derived entirely from the vehicle search, in fact ample probable cause for the residence search warrant exists independently of Trooper Koeberl's discovery of methamphetamine in Mr. Moore's van. But even if probable cause in the residence search warrant was wholly derivative of the vehicle search, the vehicle search was constitutional and therefore the apartment search is not fruit of a poisonous tree. The Court therefore recommends denying Mr. Moore's suppression motion as to the warranted search of Mr. Moore's residence. The attorneys indicated at the motions hearing that the discovery motion had been resolved, so the Court recommends denying that motion as moot. There was no briefing or argument from either party on Mr. Moore's challenge to the seizure of the Ring doorbells (Def.'s Mot. to Suppress 2, Dkt. No. 21) pursuant to the initial premises search warrant (Gov. Ex. 5), nor did Mr. Moore challenge the subsequent seizure of the video footage in the doorbell cameras pursuant to the warrant that is in evidence as Gov. Ex. 7. The Court considers Mr. Moore's challenges to the seizure of the Ring video footage and data to have been waived, but even if they were not, the Court would recommend denying the motion to suppress the Ring camera video footage.

## BACKGROUND

A grand jury in the State and District of Minnesota indicted Mr. Moore on August 8, 2025. The United States alleges that Mr. Moore trafficked fentanyl and other illegal drugs from Chicago, Illinois to the Twin Cities area for further distribution across greater Minnesota. (Gov.'s Post-Hr'g Br. 2–3, Dkt. No. 40.) These charges stem from evidence recovered in two searches: 1) methamphetamine found in Mr. Moore's vehicle upon being stopped and searched, without a warrant, by Minnesota State Trooper Kyle Koeberl on May 8, 2025; and 2) fentanyl and a firearm found in his apartment, which officers searched pursuant to a warrant after Mr. Moore's arrest. (*Id*. at 6.) Mr. Moore seeks to suppress evidence from those two searches because he alleges that Trooper Koeberl's search of his vehicle on May 8, 2025 violated his Fourth Amendment right to be free from unreasonable searches and seizures and any evidence found at the apartment should be suppressed as fruit of that search.

### I.     Factual Background

### A.  Underlying Investigation

The charges against Mr. Moore result from a longer-term investigation of drug distribution activity in Central Minnesota. (*See* Hr'g Tr. 11:7–12, Dkt. No. 30.) That investigation was led by Crow Wing County Sheriff's Office Investigator Justin Athman, who also serves as investigator on the Lakes Area Drug Investigation Division ("LADID"), a multi-jurisdictional task force comprised of county, municipal, and tribal police departments that investigates crimes related to controlled substances in the area. (*Id*. at 8:18–9:7.) Investigator Athman, in the course of his responsibilities with LADID, received

4

information from a cooperating defendant in Central Minnesota about a source of fentanyl from the Twin Cities. This tip was shortly afterwards corroborated by a second cooperating defendant. (*Id*. at 11:19–12:3.) The first cooperating defendant identified his source by name. (*Id*. at 12:4–8.) That person will be referred to as "Individual 1" in this Report and Recommendation.[2] The second cooperating defendant, also presumably purchasing drugs from Individual 1, reported that Individual 1 purchased his supply from someone in the Twin Cities area, who had several vehicles and supplied Individual 1 through roadside or curbside transactions in the Twin Cities. (*Id*. at 12:18–23.) The second cooperating defendant also provided police with a phone number purportedly belonging to Individual 1's supplier. (*Id*.)

The information from the two cooperating defendants caused LADID to focus their investigation on Individual 1, which included physical and electronic surveillance of Individual 1, both in the Central Minnesota area and, with the assistance of local law enforcement, in the Twin Cities. (Hr'g Tr. 13:10–22, Dkt. No. 30.) In early February of 2024, Investigator Athman traveled to Minneapolis to conduct physical surveillance on Individual 1, where he witnessed and recorded a meeting between Individual 1 and another person under circumstances that Investigator Athman, based on his training and experience, found indicative of drug dealing. That person turned out to be Mr. Moore. (*Id*. at 14:16–25.) Photographs taken by Investigator Athman of that meeting were submitted by the

---

[2] The person's name is known to the Court, but because the person has not been charged in this case, nor in any other federal case, nor in Minnesota state court, the name is not being given in this Report and Recommendation.

United States as Gov. Ex. 1, which Investigator Athman testified show Individual 1 getting out of the passenger side of a white Audi SUV and getting into the passenger side of a black GMC SUV, before the GMC drove away from the scene. (*See id.*, at 16:11–17:12; Gov. Ex. 1.) This physical surveillance of Individual 1 and the white Audi caused Investigator Athman to suspect that the driver of the white Audi was Individual 1's source of the drugs he suspected Individual 1 to be re-selling in Central Minnesota. (*Id.* at 19:6–10.) Some time later, the Minneapolis Police Department, in concert with LADID, stopped the white Audi. Mr. Moore was driving the white Audi. (*Id.* 17:15–18:3.)

This information led Investigator Athman to expand the scope of the investigation to include Mr. Moore. (Hr'g Tr. 19:8–15, Dkt. No. 30.) The investigators applied for, were granted, and then executed search warrants to track the location of two phones (one assigned a Minnesota area code (the "Minnesota phone") and another assigned a Chicago area code (the "Chicago phone")) and several vehicles associated with Mr. Moore. (*Id.* at 19:13–22.) Returns from the Minnesota phone warrant showed that phone was sometimes located near Individual 1's phone (the location of which law enforcement was also tracking (Gov. Ex. 5 at 3)) and that the Minnesota phone and Individual 1's phone were in communication with each other. This information led Investigator Athman to conclude that Mr. Moore and Individual 1 were meeting for drug transactions. (*Id.* at 20:25–21:12.) Throughout the investigation, Investigator Athman and his colleagues witnessed multiple short-term encounters in Minneapolis between Individual 1 and Mr. Moore, which Investigator Athman testified was behavior consistent with drug transactions. (*Id.* at 24:4–13.) Law enforcement also identified a downtown Minneapolis apartment as Mr. Moore's

residence, even though the apartment was rented in a different name. (*See id*. at 21:19–22:25.)

Finally, phone and vehicle tracking data, gathered pursuant to warrants, showed that Mr. Moore made multiple trips between the Twin Cities and Chicago in the spring of 2025, during which he either drove or flew from the Twin Cities to Chicago, then drove back to the Twin Cities after only a short time in Chicago. (*See* Hr'g Tr. 24:21–26:2, Dkt. No. 30.) The last of these trips was in early May of 2025. On May 6 or 7, Investigator Athman learned that Mr. Moore had flown to Chicago, which was later confirmed by physical surveillance in the Chicago area by the Drug Enforcement Administration ("DEA"). (*Id*. at 26:4–23.) The DEA agents identified Mr. Moore as driving an "older van … a GMC, roughly mid-'90s." (*Id*. at 26:20–25.) Using phone location data, Investigator Athman learned on May 8 that Mr. Moore had left Chicago in the early morning hours that day. Investigator Athman suspected Mr. Moore was on his way back to the Twin Cities in the mid-90's GMC van with illegal drugs purchased in Chicago, which he would resell for distribution in Minnesota. (*Id*. at 27:4–25.) Investigator Athman contacted the Minnesota State Patrol and other agencies assisting with the investigation in an attempt to surveil Mr. Moore on his drive back to Minnesota, with the goal of eventually finding a reason to stop the van and search it for drugs. (*Id*. at 27:15–20.)

**B. May 8, 2025: Mr. Moore's Stop and Arrest**

While Mr. Moore was driving back to Minnesota, Investigator Athman met with Minnesota State Patrol Trooper and canine handler Kyle Koeberl, and told Trooper Koeberl about "the overarching investigation, concerns related to the investigation, and the

suspicions that likely Mr. Moore was transporting … a quantity of controlled substances … to the Minneapolis metropolitan area." (Hr'g Tr. 28:7–13, Dkt. No. 30.) Investigator Athman agreed that he told Trooper Koeberl that he was "investigating Mr. Moore as a potential source of supply who was potentially picking up narcotics in Chicago, bringing them back to Minnesota, and then further distributing them in Central Minnesota." (*Id*. at 28:19–23.) Investigator Athman asked Trooper Koeberl to stop Mr. Moore after Mr. Moore passed him, instructing him to identify a reason other than the narcotics investigation to stop and search Mr. Moore's vehicle, so that if no drugs were found in the car, the stop would not reveal to Mr. Moore the existence of the investigation and the investigators' knowledge of Mr. Moore's drug trafficking.

Trooper Koeberl, who testified after Investigator Athman and who was sequestered during that testimony, confirmed that he had discussed the investigation with Investigator Athman when they met. He said that the two met in-person during the mid-morning of May 8 at the weigh station on Interstate 94 just west of the Minnesota/Wisconsin border. (*See id*. at 65:22–24; 66:10–11). He said that Investigator Athman provided him with "their ops plan [and] with their rundown of reasonable suspicion that Moore was trafficking narcotics from Chicago back to Minnesota." (*Id*. at 66:1–3.) After the meeting, Trooper Koeberl waited at the weigh station until other officers surveilling Mr. Moore's van in Wisconsin notified him that Mr. Moore was close. When he saw Mr. Moore's GMC van pass by, Trooper Koeberl began following him. Trooper Koeberl's recording devices, one dash-mounted camera (the footage from which is in evidence as Def. Ex. 1) and one body-worn camera (the footage from which is in evidence as Gov. Ex. 4), began recording sometime

8

after Trooper Koeberl began following Mr. Moore's van. Throughout the BWC recording, Trooper Koeberl can be heard narrating events.

That footage shows Trooper Koeberl driving to the left and slightly behind Mr. Moore's van before ultimately pulling behind the van and signaling it to pull over. (Def. Ex. 1, 0:00–1:45.) When the van stopped, Trooper Koeberl approached the driver's door of the van and engaged Mr. Moore in conversation, saying that he pulled him over for having excessive window tint and suspended objects that blocked the windshield. Trooper Koeberl also asked Mr. Moore about his recent travel. (Gov. Ex. 4, 2:15–3:30.) Trooper Koeberl asked Mr. Moore for his license, and, noticing that Mr. Moore said he lived in Minnesota but provided an Illinois license with a Commercial Driver's License endorsement, talked to Mr. Moore about the need for him to update his license in Minnesota. When asked about his travel, Mr. Moore said he was returning to Minnesota from Knapp, Wisconsin, where he had intended to purchase a part for his truck. (*Id.* at 3:15–5:30.) Trooper Koeberl then returned to his squad and ran Mr. Moore's information through various police databases, including a network of license plate readers, to check the veracity of Mr. Moore's story and discuss the situation with another trooper, who had arrived after Trooper Koeberl had stopped Mr. Moore. (*Id.* at 7:10–8:50.) All this took roughly fifteen minutes, and the BWC footage shows that this time was largely spent on hold with the private company that manages the license plate reader system or waiting for representatives of that company to find the information Trooper Koeberl had requested. (*Id.* at 7:10–22:30.) Trooper Koeberl was told that the license plate on Mr. Moore's van had been picked up by a license plate reader two hours *east* of Knapp—inconsistent with

9

Mr. Moore's westward travel having begun in Knapp—and that his van had also been seen over the preceding few days in and around Chicago. (Hr'g Tr. 73:1–15, Dkt. No. 30.)

After learning this, Trooper Koeberl returned to Mr. Moore, and asked him to get out of his car, purportedly to talk to him about the warning he would issue regarding the suspended objects, excessive tint, and the need to update his license in Minnesota. (Gov. Ex. 4, 22:35–24:25.) After discussing the warning, he asked Mr. Moore if he would keep talking to him about his travels, to which Mr. Moore consented. (*Id*. at 24:26–25:38.) Trooper Koeberl identified some inconsistencies in Mr. Moore's description of his travels, including that his vehicle had been located in the Chicago area earlier that morning, undermining his story that he had driven to and was returning from Knapp, Wisconsin. Trooper Koeberl then asked Mr. Moore whether he had anything illegal in his car, listing specific types of drugs. (*Id*. at 25:45–26:10.) Mr. Moore provided a verbal negative response to each except "methamphetamine," to which he only shook his head. (*Id*.) Trooper Koeberl then asked Mr. Moore if he could search the van, saying he suspected the van contained illegal drugs. (*Id*. at 26:30–26:52.) After initially seeming open to the search, Mr. Moore appears to have denied consent after Trooper Koeberl told him he was not compelled to give it. (*Id*. at 26:53–27:05.)

After Mr. Moore denied consent to search, Trooper Koeberl patted him down for weapons and asked him to stand with two other troopers on scene, while he executed a preliminary dog sniff around the van for illegal drugs. (Gov. Ex. 4, 27:25–30:00.) Trooper Koeberl completed multiple passes around the outside of the van with the dog, named Bolo. In the first two passes, Bolo exhibited no major behavior changes, (*id*. at 30:16–31:00), but

10

on subsequent passes, his breathing intensified around the rear passenger door seal, and he ultimately chose to focus on that area, searching up and down the door seal before ultimately sitting and staring at the point where the front and rear passenger doors met. (*Id.* at 31:00–32:13.) Trooper Koeberl then returned Bolo to his squad and notified Mr. Moore and the other troopers that he planned to do a more extensive search of the inside of the van, also providing Mr. Moore an explanation of his *Miranda* rights. (*Id.* at 32:24–33:30.)

The troopers then placed Mr. Moore in the back of the other trooper's vehicle and began searching the interior of the van, originally using Bolo again, in an attempt to narrow their search. (Gov. Ex. 4, 33:30–43:23.) After some time running Bolo through the vehicle, Trooper Koeberl brought him back to his squad, and the troopers searched the van on their own. (*Id.* at 43:25–49:30.) Eventually, after noticing that two laundry detergent containers[3] were lighter than they ought to have been, Trooper Koeberl opened them and found what appeared to be bags of illegal drugs hidden inside. (*Id.* at 49:55–53:02.) The troopers then placed Mr. Moore under arrest.  (*Id.* at 53:12–56:30.)

## II.   <u>Legal Standards</u>

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated…" U.S. Const. amend. IV. "The exclusionary rule generally prohibits admission of evidence seized during an unlawful search," *United States v. Escudero*, 100

---

[3] At the hearing, Trooper Koeberl testified that drugs are often hidden in or transported with containers of laundry detergent or other strong-smelling products in an effort to avoid detection by drug-sniffing dogs. (*See* Hr'g Tr. 69:19–70:23.)

F.4th 964, 968 (8th Cir. 2024). "The exclusionary rule extends to evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018). To survive a suppression motion, where "the defendant establishes a nexus between a constitutional violation and the discovery of evidence sought to be excluded, the government must show the challenged evidence did not arise by exploitation of that illegality." *Id*.

## A.  Traffic Stops

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "A traffic stop is a seizure, so it must be supported by reasonable suspicion or probable cause." *United States v. Maurstad*, 35 F. 4th 1139, 1143 (8th Cir. 2022) (citing *United States v. Hollins*, 685 F. 3d, 703, 705-06 (8th Cir. 2012)).

"Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (cleaned up). Reasonable suspicion exists, and will justify a "a brief investigative traffic stop," when an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Because reasonable suspicion is a "less demanding" standard than probable cause, it can be satisfied "with information that is different in

quantity or content than that required to establish probable cause." *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion "depends on the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id*. (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)).

While reasonable suspicion will suffice to justify an investigatory stop of a motor vehicle, the officer can only take the further step of searching the vehicle if there is probable cause to believe that contraband or evidence of a crime will be found in the vehicle. "Probable cause exists, when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021) (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017)). Probable cause can be established by the issuance of a judicial search warrant. If a search is conducted without the authority of a judicially authorized search warrant, the prosecution has the burden of showing that the search falls into one of several well-recognized exceptions to the Fourth Amendment's warrant clause. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "When the United States seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." *United States v. Riedesel*, 987 F.2d 1383, 1388 (8th Cir. 1993).

One well-recognized exception to the warrant requirement is the automobile exception. Under that exception, if law enforcement officers have probable cause to believe

that a motor vehicle contains evidence of criminal activity or contraband, they may conduct a complete search of "every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982); *see also United States v. Payton*, No. 23-CR-192 (KMM/DLM), 2024 WL 1343121, at *4 (D. Minn. Mar. 29, 2024).

"Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hollins*, 685 F. 3d 703, 706 (8th Cir. 2012). This standard is an objective one; an officer's subjective state of mind "is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Whren v. United States*, 517 U.S. 806, 812–813 (1996)); *Arkansas v. Sullivan*, 532 U.S. 769, 770 (2001)) (holding probable cause exists when circumstances, viewed objectively, would justify officer's actions). In other words, a stop or a search is justified if, viewed objectively, there is reasonable suspicion or probable cause, as the case may be. This is true even if the officer's subjective intent is to make the stop as a pretext for another investigation. *United States v. Linkous*, 285 F. 3d 716, 719 (8th Cir. 2002). The duration of a traffic stop premised on reasonable suspicion can be no longer than needed to handle the matter for which the stop was made. A stop that exceeds this limit "violates the Constitution's shield against unreasonable seizures," and becomes unlawful unless law enforcement has reasonable suspicion to continue the detention. *Rodriguez v. United States*, 575 U.S. 348, 351 (2015).

## B. Collective Knowledge Doctrine

If officers are sharing communications about a criminal investigation, then reasonable, articulable suspicion or probable cause may be based on the collective knowledge of all the officers working on that case. *United States v. Warfield*, No. CR 06-

50(2) (DSD/JJG), 2006 WL 8425316, at *1 (D. Minn. Apr. 14, 2006), *R&R adopted*, 2006 WL 1472727 (D. Minn. May 24, 2006); *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005). If the police have conducted a lengthy investigation, and a new officer is brought onto the team to execute a search or arrest, the new member may rely on the collective knowledge of the investigative team to justify an unwarranted roadside search or seizure if there is "some degree of communication" between an existing member of the investigative team and the new officer. *Williams*, 429 F. 3d at 772.

## DISCUSSION

The chief substantive issue before the Court is the constitutionality of Trooper Koeberl's stop, dog sniff, and search of Mr. Moore's vehicle on May 8, 2025. Though Mr. Moore seeks suppression of the drugs and firearm found in his apartment, that evidence is challenged as fruit of the May 8 roadside search because the evidence obtained from the roadside search was used in the affidavit in support of the warrant application for the apartment search. Mr. Moore argues that the constitutionality of the apartment search rises or falls on the constitutionality of the search of Mr. Moore's van. The Court finds the stop and search of the van was constitutionally justified both on the basis of Trooper Koeberl's independent observations and on the basis of the collective knowledge doctrine. Those analyses are taken up in turn.

## I.    Trooper Koeberl's Independent Observations

When Trooper Koeberl caught up to Mr. Moore's van on I-94, the trooper was able to see that the van's window tint was darker than allowed by state law and that there was an object dangling from the rearview mirror, which is also a violation of Minnesota law.

15

(Hr'g Tr. 66:23–67:1, Dkt. No. 30.) Because any traffic violation, no matter how minor, will justify a traffic stop, Trooper Koeberl's initial stop of Mr. Moore was constitutional. While Mr. Moore argues that Trooper Koeberl did not actually make these observations because his dash cam footage (Def. Ex. 1) does not show the squad pulling level with the van, the Court found Trooper Koeberl's testimony credible, and also indirectly corroborated by later BWC footage of the window tint and the objects hanging from the rearview mirror. (Gov. Ex. 4 at 2:20 – 2:35.)[4]

The more formidable defense argument is that Trooper Koeberl impermissibly extended a stop for overly-tinted windows and objects hanging from the rearview mirror— violations for which Trooper Koeberl ultimately issued only a warning (Hr'g Tr. at 75:14– 18)—into a prolonged stop that included questioning about commercial driver licenses, a delay while data from license plate readers was obtained and then analyzed, and a walk-around by a narcotics detection dog. The Court finds that the extension of the stop was permissible. Trooper Koeberl testified that immediately upon approaching Mr. Moore's vehicle, he noticed the smell of laundry detergent, which he knew from his training and experience to be a masking agent, so called because it is intended to mask the smell of illegal narcotics from detection dogs. (*Id.* at 69:19–70:18.) Trooper Koeberl also saw a

---

[4] While the dash cam video shows Trooper Koeberl well behind Mr. Moore's van, the video begins after Trooper Koeberl began following Mr. Moore, meaning that it was possible that he pulled further alongside Mr. Moore's van and could observe these things before he turned on the camera. After the video begins, Trooper Koeberl can be heard to say that he saw suspended objects and heavy tint on the front windows. The only evidence of what Trooper Koeberl saw before the video begins is his testimony, and the Court has identified no reason to question the reliability of his testimony.

"Black Ice" brand air freshener, which he knew, again from his training and experience, to also be commonly used to mask the scent of narcotics. (*Id*.)

At this point, Trooper Koeberl asked Mr. Moore for his driver's license and talked with him about where he was coming from and going to. This would be permissible in any traffic stop, and certainly one in which an officer recognized the scent of masking agent and saw Black Ice. "[A] reasonable investigation during a traffic stop 'may include asking for the driver's license and registration . . . and asking the driver about his destination and purpose." *United States v. Riley*, 684 F. 3d 758, 764 (8th Cir. 2012). It then developed that Mr. Moore claimed a Minnesota residence, but proffered an Illinois commercial driver's license. When Mr. Moore stated that he was coming from Knapp, Wisconsin, the totality of the circumstances justified Trooper Koeberl in prolonging the stop by about fifteen minutes so he could access and analyze data from a network of license plate readers. That data heightened Trooper Koeberl's suspicions. As noted above, he found that the license plate on Mr. Moore's van had been picked up by a license plate reader east of Knapp and that the van had also been seen over the preceding few days in the Chicago area. (Hr'g Tr. 73:1–15, Dkt. No. 30.) With all of this, Trooper Koeberl was well justified in running a trained and certified narcotics detection dog around Mr. Moore's van, and, when the dog alerted, in searching the van. That search led to the discovery of methamphetamine.

Mr. Moore tries to cast doubt on whether Bolo's alert could be taken for probable cause. While conceding that the dog did well in detecting drugs under controlled circumstances, Mr. Moore points out that when working real cases the dog's success rate fell to 54%, or in Mr. Moore's words, "not a whole lot better than a coin toss." (Def. Br. 8,

17

Dkt. No. 31.) The law, however, is clear; an alert by a certified narcotics detection dog such as Bolo, even standing alone, provides probable cause to search. *United States v. Donnelly*, 475  F.3d 946, 955 (8th Cir. 2007) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir.1999)). This Court will decline the defense's invitation to look behind the fact of certification and inquire whether that certification was improvidently granted.[5] If 54% is not enough for the certification to be valid, will 55% suffice? 60%? The defense provides no caselaw support for undertaking such an inquiry, nor did the defense provide any expert testimony to guide the Court in how to distinguish between a validly and an invalidly bestowed certification. In any event, such an inquiry would not only be legally unsupportable, it would also be pointless. The dog's alert should not be considered in isolation. The question is not whether Bolo's alert alone constituted probable cause (even though, under the governing caselaw, it did), but whether Trooper Koeberl, under the totality of the circumstances, possessed probable cause to search Mr. Moore's van. Given the smell of masking agent, the presence of Black Ice, the lack of knowledge of commercial driving license laws, the false story about coming from Knapp and not Chicago—all capped off by Bolo's alert—the Court finds that there was a "fair probability" of finding narcotics in Mr. Moore's van.

Finally, Mr. Moore argues that a review of the BWC footage will show that Bolo did not, in fact, find the drugs when he was deployed in the van, which provides proof that

---

[5] The testimony at the motion hearing about Bolo's training and certification was exhaustive, both in length and comprehensiveness. (*See generally*, Hr'g Tr. 37–62; Gov. Exs. 2-3.) Suffice it to say that the Court has no reason to doubt that Bolo was "really" certified.

he was unreliable. Upon review of the BWC video and the extensive documentation of the dog's training record, (*see* Gov. Exs. 2–3), the Court finds these arguments unconvincing, both because the interior dog sniff is constitutionally irrelevant and because Trooper Koeberl's testimony in the hearing, explaining the mechanics of narcotics-related drug sniffs, and the BWC footage shows that Mr. Moore has not met his burden of showing that Bolo was unreliable. While Bolo's first two passes around the van did not show much change in behavior, (Gov. Ex. 4, 30:09–30:59), he clearly changed direction and revisited the passenger side door seal on the third pass, a change that Trooper Koeberl noted, in real time, as significant. (*Id*. at 31:00–31:15.) On the next pass, Bolo spent even more time at that location and exhibited what Trooper Koeberl described as "alert behavior[—]a change in posture and increased respirations." (*Id*. at 31:20–32:10; Hr'g Tr. 78:25–79:1; 82:5–24, Dkt. No. 30.) Ultimately, Bolo gave a positive indication for the odor of narcotics in that same area. (Hr'g Tr. 83:11–84:9.) The positive dog sniff provided probable cause for a more in-depth search of the interior of the van, during which Trooper Koeberl and his colleagues found narcotics hidden in what appeared to be laundry detergent.

As for the dog sniff inside the van, there is a factual dispute as to whether Bolo actually indicated that he had detected the odor of narcotics. Mr. Moore argues that he did not, describing the BWC footage as showing that Bolo "showed no interest in" the detergent boxes, "[e]ven when Trooper Koeberl used his hands to direct [Bolo] to the detergent boxes." (Def.'s Br. 9, Dkt. No. 31.) The United States says that Bolo did alert inside the vehicle, citing Trooper Koeberl's testimony. (Gov.'s Br. 6, Dkt. No. 40.) At the hearing, Trooper Koeberl said, "[i]nside the vehicle, which we didn't get into, he showed

19

alert behavior and then indicated to the right of where the drugs were found." (Hr'g Tr. 87:12–15.) Asked to clarify, Trooper Koeberl said, "[O]dor is a strange thing. It all depends on temperature, hot/cold, wind direction, speed. So where odor pools, I can't control. But the dog will just go to what he believes is the strongest source of odor. If he can find that, he may indicate." (*Id*. at 87:18–22.)

Ultimately, Mr. Moore points the Court to the BWC footage to make the determination. (Def.'s Br. 11, Dkt. No. 31 ("[T]he best evidence of that is not by statistics, but by simply watching the video.").) The BWC footage does not provide the clearest picture into this question. The van is full of objects that Bolo had to navigate, and there was no space inside it for him to fully sit down and stare at a specific place such that it can be said that he did or did not indicate the presence of narcotic odor. The nature of the interior search meant that it is hard to discern, especially by viewers, such as the Court, who are not trained dog handlers, whether a specific movement from Bolo is alert behavior or a step over or around an item in the van.

Mr. Moore's argument invites the Court down a rabbit hole, which the Court declines. The law in the Eighth Circuit is clear: a trained dog's alert on the outside of a car gives the police probable cause to search the inside of the car. *United States v. Holleman*, 743 F.3d 1152, 1156 (8th Cir. 2014). Bolo alerted on the outside of the car. Bolo has extensive training and certification. (*See* Gov. Exs. 2–3.) That Trooper Koeberl brought Bolo out again, to narrow the interior search that he planned to conduct regardless of Bolo's response, is of no constitutional relevance. In the roadside search, Bolo was used for two distinct purposes, first as a tool to determine whether there was probable cause to search

the inside of the vehicle, and second, as a tool to make the interior search easier on the troopers conducting the search. Here, Bolo's performance in pursuit of the second purpose has no bearing on the validity of the conclusions drawn from his performance in pursuit of the first.

Even if the Court found that a determination of whether Bolo indicated inside the van was helpful, it is not outcome-determinative here. The Eighth Circuit has held that a drug sniffing dog is "presumptively reliable at detecting illicit drugs … if the dog has satisfactorily completed a bona fide certification or training program." *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024). The burden is on Mr. Moore to show that the certification or training program is inadequate or the circumstances surrounding the alert undermine the case for probable cause. *Id*. He has not done so. There are colorable arguments on both sides as to the specific question of whether Bolo indicated inside the van. The Court is not convinced one way or the other, but even if Bolo did not indicate inside the van, the Court does not find that non-indication sufficient to overcome the presumption of reliability established in *Collier*. Given the conflicting evidence on whether Bolo actually indicated during the interior search, the fact that he correctly identified the odor of narcotics outside the vehicle, Bolo's training and certification history, and the multiple other sources of probable cause identified throughout this Report & Recommendation, the Court finds that there was probable cause to search Mr. Moore's van.

Probable cause was present, and the search, though conducted without a judicial warrant, was constitutional under the automobile exception to the Fourth Amendment's

warrant clause. The Court recommends that the motion to suppress the fruits of Trooper Koeberl's search be denied.

## II.     Collective Knowledge and "Whisper Stops"

Even if the methamphetamine found in Trooper Koeberl's search should be suppressed when evaluating that search only on the basis of Trooper Koeberl's independent observations, the search is justified under the collective knowledge doctrine.

Investigators in this case had probable cause to believe that there were drugs in Mr. Moore's van when he left Chicago in the early morning hours of May 8, 2025, and any officer in contact with Investigator Athman or other members of the investigative team about their investigation would have been justified in stopping and searching his car. The law on the collective knowledge doctrine in the Eighth Circuit is well-settled: all that is required to bring a new officer into the fold of an investigation so that they may rely on the collective knowledge of the investigative team in making an unwarranted roadside search or seizure is "some degree of communication" between an existing member of the investigative team and the new officer. *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005). That standard was met here, where the lead investigator (Investigator Athman) met with the searching officer (Trooper Koeberl) in person and provided the searching officer with several important details about the investigation, including "the overarching investigation, concerns related to the investigation, and the suspicions that likely Mr. Moore was transporting … a quantity of controlled substances … to the Minneapolis metropolitan area." (Hr'g Tr. 28:7–13, Dkt. No. 30.)

Because the knowledge gained from the investigation could be imputed to Trooper Koeberl, and that investigation had collected substantial evidence that Mr. Moore was distributing controlled substances in the Central Minnesota region, Trooper Koeberl had probable cause to stop and search Mr. Moore's van, even without reason to believe he had committed traffic violations, and even without conducting a dog sniff on the car. However, for thoroughness, the Court addresses the parties' arguments.

### A.     "Whisper Stops" Generally

The parties spend much of their briefing discussing the fact that Investigator Athman asked Trooper Koeberl to identify a reason to stop and search Mr. Moore's car independent of the underlying drug trafficking investigation. Mr. Moore argues that this so-called "whisper stop" technique means that the stop, its extension, and the subsequent search violated his Fourth Amendment right to be free from unreasonable searches and seizures. In analyzing the caselaw and understanding the investigative value of a "whisper stop," the Court does not concur.

Though not explained thoroughly by the parties, the Court understands that the purpose of the "whisper stop" technique in this case and many others like it was to protect the integrity of the investigation from becoming apparent to *Mr. Moore*, not to identify reasonable suspicion to make a stop or probable cause to conduct a search for later judicial review. It was to have a plausible explanation to give to Mr. Moore about why he was stopped and searched. There is no evidence to show that Mr. Moore was aware on May 8 of the months-long investigation into drug distribution by him and Individual 1. If Trooper Koeberl had told him that he was being stopped and searched because he was suspected of

23

trafficking drugs and no drugs were found, Trooper Koeberl would not have been able to arrest Mr. Moore, and Mr. Moore likely would have taken actions that would hinder further investigation, like disposing of his phones, obtaining other vehicles, or notifying Individual 1. By telling Mr. Moore the stop and search were related to infractions personally witnessed by Trooper Koeberl, the investigation was protected until Mr. Moore was in custody for drug possession. A "whisper stop" is a police operational technique, not a rule of constitutional law. There is no constitutional significance to the fact that Trooper Koeberl was instructed to (and did) provide Mr. Moore with a false reason why he chose to pull Mr. Moore over and search his vehicle, nor are the police under any obligation to disclose to investigative subjects the true reason they choose to use particular investigative tools. *See e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *United States v. Laurita*, 821 F.3d 1020, 1025–26 (8th Cir. 2016); *United States v. Williams*, 429 F.3d 767, 771 (8th Cir. 2005).

This conclusion comports with past decisions in this District and courts across the country directly addressing the question of so-called "whisper" or "wall" stops. In *United States v. Gaston*, District Judge John R. Tunheim held that "'whisper' or 'wall-off' stop[s] … are often used when officers have investigative information that they do not wish to reveal to a suspect." No. 19-CR-211 (JRT/BRT), 2021 WL 1263453, at *2 (D. Minn. Apr. 5, 2021). In *Gaston*, as here, "[n]one of the officers testified that they thought probable cause was lacking." *Id*. at *5. In both cases, the lead investigator "testified that he wanted the Minnesota State Patrol [trooper] to establish [his] own probable cause 'if possible' and that this type of stop is common when officers wish to keep investigative information from a suspect during an investigation." *Id*. *See also United States v. Chavez-Torres*, No. 22-

24

CR-150 (DWF/TNL), 2023 WL 5003801, at *10 (D. Minn. May 22, 2023) *R&R adopted*, 2023 WL 4741199 (D. Minn. July 25, 2023); *United States v. Alonzo*, No. 15-CR-165 (JRT/LIB), 2016 WL 1531522 (D. Minn. Apr. 15, 2016). Multiple circuit courts have held whisper stops to be a valid investigatory technique where other constitutional protections are upheld. *See United States v. Balser*, 70 F.4th 613, 621 (1st Cir. 2023); *United States v. Sanchez*, 839 F. App'x 388, 391 (11th Cir. 2020); *United States v. Hawley*, 660 F. App'x 702, 704 n. 1 (10th Cir. 2016); *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016).

This case is similar to *United States v. Alonzo*, No. 15-CR-165 (JRT/LIB), 2016 WL 1531522 (D. Minn. Apr. 15, 2016). There, a DEA Task Force Officer asked a Minnesota State Trooper to conduct a "wall stop" of the defendant after the DEA Officer saw the defendant and others under investigation for drug trafficking load bags into three vehicles, in the manner the subjects had previously trafficked drugs. *Id*. at *1. In that case, the DEA officer told the trooper that "the Jeep was involved in a DEA narcotics investigation and was suspected of carrying illegal narcotics." *Id*. at *2. That trooper then contacted a second trooper and asked the second trooper to do a "wall" stop on one of the defendants. *Id*. The second trooper caught up with the vehicle, saw that the rear passenger was not wearing a seatbelt, and stopped the vehicle on that purported basis. *Id*. The second trooper extended the stop until the first trooper arrived with his narcotics-sniffing dog, which ultimately located heroin, prescription pills, a firearm, and a digital scale. *Id*. at *3. The stop by the second trooper and the extension of that stop to allow the dog sniff by the first trooper were upheld.

25

Here, as in the cases discussed above, the Court sees no reason to find that a whisper stop is *per se* invalid. The issues that must be addressed are whether Trooper Koeberl, either through his own observations or through information shared with him by Investigator Athman, had 1) reasonable articulable suspicion to stop Mr. Moore and 2) probable cause to search Mr. Moore's van. The Court has already found that Trooper Koeberl's independent observations justified each step of the stop and search of Mr. Moore's van. The Court now finds that the knowledge imputed to Trooper Koeberl by Investigator Athman in their discussion also provided Trooper Koeberl with reasonable articulable suspicion and probable cause for first the stop and then the search.

## B.      The Initial Stop

In *Alonzo*, the court found that the initial traffic stop was validly initiated based on the trooper's testimony that he saw the rear passenger without a seatbelt, even though the defendant argued that there was no way he could have seen the seatbelt. *Alonzo*, at \*5. Because the court found the trooper's testimony at the motion hearing to be credible, it concluded that the initial stop was valid because Minnesota law allowed police to make a traffic stop based on an officer's belief that an occupant was not wearing a seatbelt. *Id*. The court next addressed the argument that the troopers unreasonably prolonged the stop beyond the time necessary to investigate the seatbelt violation. On that issue, the court agreed that once the trooper "checked [the driver's] license and registration and issued the written warning, the traffic-related mission of the seizure was complete, and the traffic violation alone could not support prolonging the stop for the canine sniff search." *Id*. However, the court did not order that the evidence recovered from the stop be suppressed

26

because the DEA officer had "reasonable and articulable suspicion that the [vehicle] was transporting heroin," (*id.*), which was imputed to the troopers under the collective knowledge doctrine, allowing them to extend the stop for the canine sniff search. *Id.* at *6.

As in *Alonzo*, there is some dispute about what Trooper Koeberl actually saw before his initial stop of Mr. Moore. Trooper Koeberl testified that he thought that the window tint on Mr. Moore's van was excessively dark and that there were multiple obstructions dangling from parts of the cabin, both in violation of Minnesota traffic laws. (Hr'g Tr. 66:23–67:1, Dkt. No. 30 (Koeberl: "I was able to pull up next to the vehicle. I was able to verify that the window tint was dark, and I could see there were suspended objects from the mirror.") In his brief, Mr. Moore argues that this recollection was "questionable" because the dash cam "reveals that Trooper Koeberl never did 'pull up to the vehicle'." (Def.'s Br. 5, Dkt. No. 31.) While the Court has found Trooper Koeberl's testimony on these points credible, the Court's application of the collective knowledge doctrine makes this credibility finding unnecessary because the collective knowledge doctrine imputes the knowledge of the underlying narcotics investigation to Trooper Koeberl.

### C.    The Extension of the Stop and the Dog Sniff

The Court also comes to the same conclusion as *Alonzo* as to the issue of whether Trooper Koeberl unconstitutionally extended the stop. First (and for the moment, setting aside that Trooper Koeberl smelled masking agent and saw dangling Black Ice immediately upon walking up to Mr. Moore's window), Trooper Koeberl certainly extended the stop beyond what was necessary to simply investigate the window tint and dangling-objects offenses. As in *Alonzo*, the traffic-related mission of the seizure was complete after Trooper

27

Koeberl had enough time to check Mr. Moore's license and issue a citation or warning. This likely could have been done in a matter of a few minutes. In fact, the BWC footage shows that Trooper Koeberl returned Mr. Moore's license with a warning and a discussion about the need for Mr. Moore to update his license information roughly 15 minutes after the initial stop. (Gov. Ex. 4 at 22:46–24:25.)

Even though the stop was extended beyond what was necessary to investigate the traffic violations, the Court finds that the extension was constitutionally proper under the collective knowledge doctrine, as did the court in *Alonzo*. Investigator Athman was actively involved in the Moore investigation and certainly had reasonable articulable suspicion to believe that Mr. Moore was trafficking drugs when the stop was made, from the extensive information gained from the investigation discussed above. Knowledge of that information was imputed to Trooper Koeberl when Investigator Athman and Trooper Koeberl met at the weigh station, where Investigator Athman gave Trooper Koeberl "their ops plan [and] their rundown of reasonable suspicion that Moore was trafficking narcotics from Chicago back to Minnesota." (Hr'g Tr. at 66:1–3, Dkt. No. 30.) This, as discussed above, clears the low bar of "some degree of communication" that legitimates application of the collective knowledge doctrine discussed in *Williams*, 429 F.3d 767, 772 (8th Cir. 2005), and *Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001). As in *Alonzo*, after that communication took place, Trooper Koeberl "became part of the search team and thus had an imputed reasonable suspicion of narcotics trafficking that was constitutionally sufficient, on its own, to warrant prolonging the stop." *Alonzo* 2016 WL 1531522, at *6.

### D.     Initial Consent to Continued Conversation

Mr. Moore also consented to a brief extension of the stop when he continued to interact with Trooper Koeberl after he was issued the traffic warning. At the 24:25 mark in the BWC footage, the stop as to the traffic violations was complete. Trooper Koeberl had returned Mr. Moore's license and given him a written warning for those violations. (Gov. Ex. 4 at 24:25.) Trooper Koeberl then asked Mr. Moore if he had "a few extra minutes to chat" with him, to which Mr. Moore consented, saying "no problem." (*Id*. at 24:28.) Mr. Moore's willingness to continue talking to Trooper Koeberl constituted consent to extend the traffic stop for that conversation because the Court finds that Mr. Moore's lack of any objection at all to continue the conversation and his calm demeanor showed that a reasonable officer would believe that he consented to an extension of the stop. *See United States v. Quintero-Felix*, 714 F.3d 563, 568 (8th Cir. 2013); *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010).

### E.     Dog Sniff of the Van

Generally, a police dog sniff of a vehicle is not considered a search and requires neither probable cause nor reasonable suspicion for its justification under the Fourth Amendment. *See United States v. Pulido-Ayala*, 892 F.3d 315, 318 (8th Cir. 2018) (quoting *United States v. Williams,* 429 F.3d 767, 772 (8th Cir. 2005). However, the extension of a stop to conduct a dog sniff on a vehicle requires reasonable suspicion of criminal activity beyond the traffic violation originally justifying the stop. *Rodriguez v. United States*, 575 U.S. 348, 358 (2015). Assuming that Mr. Moore did not consent to the dog sniff and revoked his consent to prolonging the stop after Trooper Koeberl asked to search the van,

Trooper Koeberl's conversation with Investigator Athman gave Trooper Koeberl independent reasonable suspicion that the van was being used to traffic narcotics. This information justified prolonging the stop for the dog sniff. *See Alonzo* 2016 WL 1531522, at *6.

### F.    The Roadside Search

The search of Mr. Moore's van was supported by probable cause, as required by the automobile exception to the Fourth Amendment's warrant requirement. *See United States v. Dunn,* 928 F.3d 688, 693 (8th Cir. 2019) (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000).) As discussed above, that probable cause comes from Trooper Koeberl's knowledge, both his actual knowledge and the knowledge imputed to him through his conversation with Investigator Athman, of the entire investigation into Mr. Moore's alleged drug trafficking. This includes those elements to which Investigator Athman testified at the Motion Hearing and Trooper Koeberl's observations of Bolo's alert, indicating that the vehicle may have been emitting the odor of narcotics. As discussed earlier in this Report and Recommendation, an alert by a certified narcotics detection dog, standing alone, gives an officer probable cause to believe that there are drugs present.

Ultimately, even if Trooper Koeberl had stopped Mr. Moore, immediately detained him, and searched the van, the drugs found from that search would not be suppressible on Fourth Amendment grounds because the underlying investigation and the conversation with Investigator Athman provided Trooper Koeberl with probable cause for the search. The additional measures taken by Trooper Koeberl were constitutionally unnecessary but

30

were made to protect the integrity of the investigation. Mr. Moore's Motion to Suppress Evidence from the roadside search (Dkt. No. 20) should be denied.

### III.    Search Warrant Fruits are Not Suppressible

Mr. Moore argues that, because the evidence found during the search of his van was obtained unconstitutionally and that evidence was used in the affidavit in support of a search warrant for his apartment, any evidence derived from that warrant or the two follow-on warrants (one for a firearm and one for the Ring doorbells' video footage) must be suppressed. (*See* Def.'s Mot., Dkt. No. 21.) Because the Court concludes that the roadside search of his van did not violate Mr. Moore's constitutional rights, there is no basis to suppress the evidence derived from subsequent search warrants that relied on that evidence. On this basis, Mr. Moore's Motion to Suppress Evidence from the search of his apartment (Dkt. No. 21) should be denied.

Even if the roadside stop and search were constitutionally infirm, however, the warrants should still be found valid. The affidavits in support of the applications for all three warrants—the original warrant to search Moore's residence (Gov. Ex. 5), the follow-on warrant authorizing seizure of a firearm found during the execution of the first warrant (Gov. Ex. 6), and another follow-on warrant authorizing seizure of video footage from two Ring surveillance cameras seized during the execution of the original warrant (Gov. Ex. 7)—describe facts sufficient to establish probable cause, even in the absence of Trooper Koeberl's discovery of methamphetamine. The affidavits walk through the investigation, in detail, a narrative familiar from the one the Court gave earlier in this Report and Recommendation: the two cooperating defendants, the provision by one of them of

31

Individual 1's phone number, the surveillance in Minneapolis that led to the discovery of the white Audi driven by Mr. Moore, the apparent drug deals conducted in Minneapolis, the identification of Mr. Moore as the driver of the white Audi, and Mr. Moore's trips to Chicago that were captured on tracking warrants placed on Mr. Moore's vehicle and phone. All of this would be enough to establish the required "fair probability" to believe that Mr. Moore was in the business of dealing in illegal narcotics. And since the law recognizes that it is reasonable to conclude that drug dealers who demonstrate "a continuous course of drug trafficking activity" keep items of evidentiary value at their residence, (*see United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007)), this in turn would be enough for a warrant to search Mr. Moore's residence.

## IV.    Good Faith Execution of Follow-On Search Warrants

Mr. Moore's Motion to Suppress evidence from the warrants issued after the roadside van search should also be denied on the additional ground that the officers who executed those warrants did so in good faith reliance on a judge's determination that the warrant applications established probable cause to search the places to be searched for the evidence specified in the warrant. To be clear, the Court finds no reason to doubt the constitutionality of those three search warrants. But if it did, there is no reason that the good faith doctrine would not apply to the apartment search warrants (Gov. Exs. 5–6) and the warrant for the Ring camera data (Gov. Ex. 7). Further, Mr. Moore made no substantive arguments about the admissibility of the evidence seized from the warrants beyond his argument that such evidence was fruit of an unconstitutional roadside search. The Court considers any additional arguments that Mr. Moore could have made to have been waived,

32

but for the sake of thoroughness, finds that the good faith exception to the Fourth Amendment's warrant requirement provides an additional, independent reason to deny Mr. Moore's motion as to the evidence seized pursuant to these warrants, even if such evidence is properly considered the "fruit" of the roadside van search.

A search conducted under the authority of a judicially issued warrant is presumed to be reasonable. *Franks v. Delaware*, 438 U.S. 154, 171 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant."); *United States v. Leon*, 468 U.S. 897, 914 (1984) ("Because a search warrant provides the detached scrutiny of a neutral magistrate, … we have expressed a strong preference for warrants. … The preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.") (cleaned up). A search pursuant to a judicially issued warrant "will rarely require any deep inquiry into reasonableness" because "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922 (citing *United States v. Ross,* 456 U.S. 798, 823, n. 32 (1982)).

Even if a Court finds that a judge issued a warrant that was not supported by probable cause, evidence found in a search conducted pursuant to that warrant should not be suppressed if the police executed the warrant in good faith. In *Leon*, the Supreme Court held that the exclusionary rule did not apply when the police obtain evidence by acting in "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have

33

relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916.

The *Leon* good faith exception is not boundless; it will not apply in the following four scenarios:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (citing *United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007)). A court may find that the good faith exception applies even where the police personnel who executed the warrant are the same individuals who applied for the warrant. *United States v. Mayweather*, 993 F.3d 1035, 1043 n.8 (8th Cir. 2021) ("[W]e do not vary our analysis when the officer who applies for a search warrant also executes the warrant.") (citing *United States v. Carpenter*, 341 F.3d 666, 669–670 (8th Cir. 2003); *United States v. Falso*, 544 F.3d 110, 113–14 (2d Cir. 2008)).

Generally, the preference for warrants and the great deference to be accorded to an issuing judge's determination mean that a criminal defendant bears the burden of proving that a warrant is so lacking in support that its evidentiary fruits must be suppressed. *See United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995) (citing *United States v. Garcia*, 785 F.2d 214, 222 (8th Cir. 1986). "Under traditional search and seizure law, the burden

34

is, of course, on the accused in the first instance to prove to the trial court's satisfaction that [the search technique] was unlawfully employed." *United States v. Phillips*, 540 F.2d 319, 326 (8th Cir. 1976).

Neither party addressed the warrants in any significant detail in their briefing, which is understandable given that the key issue in this case is the constitutionality of the roadside search. In fact, Mr. Moore's post-hearing brief did not address his motion to suppress the evidence from the search warrant at all. (*See* Def.'s Br., Dkt. No. 31.) Mr. Moore apparently knew that the only way he could reasonably seek the suppression of the evidence collected under the authority of the later-issued warrants was by successfully challenging the constitutionality of the roadside search. Nevertheless, the good faith exception applies here, and Mr. Moore has failed to meet his burden of showing that it does not. He presented no argument that any of the four reasons articulated in *Ortiz-Cervantes* for the non-applicability of the good faith exception to the warrant requirement apply, and the Court can identify none. There is simply no evidence in the record that would support a finding that (1) the warrant affidavits included a false statement; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant was lacking in indicia of probable cause; or (4) the warrant was facially deficient in any way. *United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (citing *United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007)). Accordingly, even if the challenged warrants were invalid, the officers who executed them did so in good faith, and the evidence found in their execution need not be suppressed.

35

## V.      The Ring Cameras Were Within the Scope of the Initial Warrant.

In his Motion to Suppress the evidentiary fruits of the search warrants, Mr. Moore claims that "Notwithstanding the illegality of the searches and seizures of the apartment, the seizure of the Ring video data inside Mr. Moore's apartment and its subsequent analysis was illegal as it was not within the scope of the warrant." (Def.'s Mot. 2, Dkt. No. 21.)

The Court understands Mr. Moore to be claiming that the particularity clause of the Fourth Amendment was violated. That clause requires warrants to "particularly describe[e] the things to be seized." U.S. Const., amend. IV. "The particularity requirement of the Fourth Amendment has a manifest purpose—to prevent general searches." *United States v. Leon,* 468 U.S. 897, 963 (1984) (Stevens, J., concurring in part). "General warrants, of course, are prohibited by the Fourth Amendment." *Andresen v. Maryland*, 427 U.S. 463, 479 (1976). The problem posed by a general warrant "is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The Fourth Amendment proscribes general searches by requiring a "particular description" of the things to be seized. *Coolidge*, 403 U.S. at 467. The particularity requirement "makes general searches … impossible and prevents the seizure of one thing under a warrant describing another." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

Mr. Moore's reference to "the warrant" is ambiguous because there are two search warrants that bear on the seizure of the video data inside the Ring cameras. First, there is

the initial warrant that authorized law enforcement to search Mr. Moore's apartment and that included among the items to be seized "Electronic devices, including but not limited to, cellular telephones and tablets, capable of electronic communication." (Gov. Ex. 5.) Second, there is a Ring camera-only warrant (Gov. Ex. 7) authorizing law enforcement to seize (from Ring, not from Mr. Moore or his apartment), various items of data kept by Ring that relate to Mr. Moore's account. For example, the warrant calls for Ring to produce the subscriber's name, address, and email address; the types of services used by the subscriber; the identifying numbers of the Ring cameras and the date the account was activated; and, at issue here, "all audio and video recordings captured by any Ring device associated with the above described account, such as live and/or stored video and audio recordings, live audio streams, images, comments, data collected from the surrounding environment, (such as motion, events, temperature and ambient light)." (Gov. Ex. 7 at 12.)

Mr. Moore's claim that the Ring camera footage was outside the scope of the warrant was the last word of argument on this point from either party. (The prosecution acknowledged that Ring cameras had been seized, but did not argue the suppression point. (Gov.'s Post-Hr'g Br., Dkt. No. 40 at 7.)) Because neither party briefed the issue or argued the issue at the hearing, the Court considers the issue waived. On its own review, the Court finds that the record in this case supports the conclusion that Ring cameras are "Electronic devices ... capable of electronic communication" under the apartment search warrant (Gov. Ex. 5).

Before turning to the initial warrant, and its authorization of law enforcement's seizure of devices "capable of electronic communication," the potential claim being made

37

that the Ring footage is outside the scope of the Ring-only warrant must be analyzed. If a claim is being made that the video footage is not within the scope of the Ring-only warrant—and again, it is not clear whether such a claim is being made—it fails. The Ring-only warrant is devoted to Ring data and nothing else. The footage is obviously within the Ring-only warrant's scope.

As to the first warrant, the only way the Court can read the defense challenge is that the warrant's specification of the things to be seized does not include Ring cameras because Ring cameras are not "capable of electronic communication," and that therefore the seizure of the Ring cameras exceeded the warrant's scope. If that is the argument, it fails, because Ring cameras can be used for electronic communication. As the affidavit in support of the application for the Ring-only warrant states:

> Your Affiant is aware Ring is a home security and smart home company owned by Amazon. Ring manufactures home security products that incorporate outdoor surveillance cameras, known to contain a high-definition camera, a motion sensor, and a microphone and speaker *for two-way audio communication. The product integrates with an associated mobile app, which allows users to view real-time audio from the camera, receive notifications when activated, and <u>communicate</u> with visitors via the integrated speaker and microphone.* The product is also capable of operating as a surveillance camera, and can automatically trigger recordings when activated, or when its motion sensors are activated. *With a subscription, users are able to store their videos to a cloud server owned by Ring.*

(Gov. Ex. 7 at 9 (emphasis added).) As the italicized language indicates, and as the italicized and underlined word "communicates" makes crystal clear, Ring cameras are capable of electronic communication. They are therefore within the scope of the initial apartment search warrant (Gov. Ex. 5.) The particularity requirement was honored and the motion to suppress the Ring video footage should be denied.

38

## VI.    *United States v. Johnson* **is Inapplicable.**

Finally, Mr. Moore cites a recent case from the Eighth Circuit with a similar fact pattern, *United States v. Johnson*, 166 F.4th 1116 (8th Cir. 2026), to support his argument that Trooper Koeberl unconstitutionally extended his stop to conduct the dog sniff. (*See* Not. of Supp. Auth., Dkt. No. 37); In *Johnson*, the Eighth Circuit held that evidence discovered in a roadside vehicle search after a drug-sniffing dog indicated for narcotics odor should have been suppressed because the police officer unlawfully extended a traffic stop beyond what was necessary to write a ticket for the observed traffic violations. *Johnson*, 166 F.4th at 1119.  While the facts relating to the officers' purported reasons for initial stop in that case closely align with those here, (*i.e.*, excessive window tint), the two cases address different legal issues that require the opposite conclusion here.

First and most importantly, *Johnson* does not address the collective knowledge doctrine at all. All the Circuit court said in *Johnson* was that "the South Dakota Division of Criminal Investigation asked Officer Stevens to pull over a car that was leaving a surveilled apartment building." *Johnson*, 166 F.4th at 1117. There was no discussion of the reason why that agency requested the stop or even if the agency told the officer that they suspected the defendant of a crime. Here, the evidence is that Investigator Athman communicated with Trooper Koeberl about the investigation, and passed information about the investigation to him, allowing Trooper Koeberl to legitimately rely on the collective knowledge of the investigative team as probable cause to search the vehicle.

Second, in *Johnson*, the United States relied on the community caretaking function, discussed in *United States v. Soderman*, 983 F.3d 369 (8th Cir. 2020), to rationalize the

39

extension of the stop. Citing *Soderman*, the United States' argument in *Johnson* was that it was not unreasonable to extend the stop because the officer's "discovery that [Johnson's] license had been suspended justifiably extended the lawful scope of the traffic stop because of [his] legal inability to remove the vehicle from the scene and the consequential need for a licensed driver or a tow truck to do so." *Johnson*, 166 F.4th at 1119. This is not a community caretaking case. If it were, perhaps *Johnson* would be informative, but the United States does not make a community caretaking argument in the case at bar.

Third, the evidence in this case shows that, even if Trooper Koeberl could not rely on the collective knowledge of the investigation as probable cause to search the vehicle, his observations and discussion with Mr. Moore at his window provided probable cause making the extension reasonable, which was absent in *Johnson*. In that case, the interaction at the vehicle seemed to be short and warranted only one sentence in the opinion: "The driver, Alex Johnson, told Officer Stevens that his license was suspended, and Officer Stevens had Johnson get out and join him in his patrol car." *Johnson*, 166 F.4th at 1117. Here, Trooper Koeberl engaged Mr. Moore in more extensive conversation on his first interaction with Mr. Moore, during which he gained information sufficient to support continuing the stop, including noticing the strong smell of laundry detergent and air fresheners and receiving an unconvincing story about Mr. Moore's travels. As discussed above, those factors, along with Trooper Koeberl's training and experience gave him probable cause to continue the stop and conduct the dog sniff around the car.

In short, in *Johnson* the Eighth Circuit found that the traffic stop was unreasonably prolonged because there was no justifiable reason for the officer to continue the stop

40

beyond the time required to write the defendant a ticket for driving on a suspended license and a warning for excessive window tint, so the evidence seized from his car should have been suppressed. Here, the Court finds that the traffic stop was prolonged beyond what was necessary to address the traffic citations, but in this case that prolongation was reasonable because Trooper Koeberl had probable cause to believe that Mr. Moore was trafficking narcotics.

## RECOMMENDATION

Therefore, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Moore's Motion to Suppress Evidence from his vehicle (Dkt. No. 20) be **DENIED**;

2. Mr. Moore's Motion to Suppress Evidence from his apartment (Dkt. No. 21) and the two Ring cameras be **DENIED**; and

3. Mr. Moore's Motion for Discovery (Dkt. No. 22) be **DENIED as moot**.

Date: March 27, 2026

*s/ John F. Docherty*
JOHN F. DOCHERTY
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written

41

objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).