**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 25-cr-315 (LMP/JFD) |
| Plaintiff, | |
| v. | **ORDER ADOPTING REPORT AND RECOMMENDATION** |
| EUGENE DARIUS MOORE, | |
| Defendant. | |

Mary Riverso, **United States Attorney's Office, Minneapolis, MN**, for Plaintiff.

Brian N. Toder, **Chestnut Cambronne PA, Minneapolis, MN**, for Defendant.

Defendant Eugene Darius Moore is indicted on one count of possession of methamphetamine and fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); two counts of possession of fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and one count of possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* ECF No. 1. Moore has filed two motions to suppress: the first relates to a search of his vehicle, *see* ECF No. 20, and the second to a search of his apartment, *see* ECF No. 21. On March 27, 2026, United States Magistrate Judge John F. Docherty issued a Report and Recommendation ("R&R") recommending denial of the two motions to suppress. *See* ECF No. 41. Moore filed timely objections to the R&R. ECF No. 44. Consequently, the Court reviews de novo the portions of the R&R to which Moore

objects, *see* Fed. R. Crim. P. 59(b)(3), and reviews for clear error the portions of the R&R to which Moore does not object, *see United States v. Newton*, 259 F.3d 964, 966 (8th Cir. 1996) (per curiam). For the following reasons, the R&R is adopted, and Moore's motions to suppress are denied.[1]

## BACKGROUND

Moore does not object to the R&R's thorough factual recitation, ECF No. 44 at 2, so the Court adopts the R&R's factual background and describes here only the facts necessary to resolve Moore's objections. Investigators from the Lakes Area Drug Investigation Division ("LADID") were investigating drug distribution activity in central Minnesota. ECF No. 41 at 4. The investigation was led by Crow Wing County Sheriff's Office Investigator Justin Athman. *Id.* The investigation uncovered evidence that Moore was involved in drug dealing and had made multiple trips between Chicago and the Twin Cities in spring 2025. *Id.* at 4–7. Using phone location data, Investigator Athman learned that Moore left Chicago in the early morning hours of May 8, 2025, and Investigator Athman suspected that Moore was traveling to the Twin Cities with illegal drugs. *Id.* at 7.

Investigator Athman contacted the Minnesota State Patrol ("MSP") in an attempt to surveil Moore on his drive back to Minnesota, with the goal of eventually finding a reason to stop Moore's vehicle and search it for drugs. *Id.* On the morning of May 8, 2025,

---

[1]    Moore also filed a motion for discovery, *see* ECF No. 22, but resolved that motion with the United States prior to issuance of the R&R. The R&R accordingly recommends denying that motion as moot. ECF No. 41 at 41. No party objects to that recommendation, so the Court will deny Moore's motion for discovery as moot.

2

Investigator Athman met with MSP Trooper Kyle Koeberl at a weigh station on Interstate 94 just west of the Minnesota-Wisconsin border. *Id.* at 7–8. Investigator Athman told Trooper Koeberl about "the overarching investigation, concerns related to the investigation," and his suspicion that Moore was purchasing illegal drugs in Chicago and transporting them to the Twin Cities for eventual distribution in central Minnesota. *Id.* at 8. Investigator Athman asked Trooper Koeberl to stop Moore after Moore passed him on Interstate 94, and he asked Trooper Koeberl to provide a reason other than the narcotics investigation to stop and search the vehicle, so that if no drugs were found in the vehicle, the stop would not reveal to Moore the existence of the investigation. *Id.*

After this meeting, Trooper Koeberl waited at the weigh station until other officers surveilling Moore's vehicle in Wisconsin notified him that Moore's vehicle was approaching. *Id.* When Moore's vehicle passed Trooper Koeberl, Trooper Koeberl began following Moore. *Id.* Trooper Koeberl's body-worn camera and dash cam recorded the ensuing stop and arrest of Moore.

Trooper Koeberl drove to the left and slightly behind Moore's vehicle before ultimately pulling behind the vehicle and signaling it to pull over. *Id.* at 9. Trooper Koeberl approached the vehicle and saw a "Black Ice" air freshener hanging from the rearview mirror, which Trooper Koeberl knew from his training and experience to be a potent air freshener commonly used to mask the scent of illegal drugs. *Id.* at 16–17. Trooper Koeberl also noted the "overwhelming odor" of laundry detergent, which he knew from his training and experience can be used to mask the smell of illegal drugs from detection dogs. *Id.* at 16; *see* ECF No. 30 at 69:17–70:18. Trooper Koeberl explained to Moore that he pulled

3

him over for having excessive window tint and suspended objects that blocked the windshield. ECF No. 41 at 9. Trooper Koeberl asked about Moore's recent travels, and Moore responded that he was returning home to Minnesota from Knapp, Wisconsin, where he had intended to purchase a part for his truck. *Id.*; *see* ECF No. 30 at 71:1–9. Trooper Koeberl asked Moore for his license, and Moore handed Trooper Koeberl an Illinois license with a commercial driver's license endorsement. ECF No. 41 at 9. Trooper Koeberl advised Moore that if he lived in Minnesota, he needed to update his license. *Id.* Trooper Koeberl asked Moore what he did for work; Moore stated that he was contracted as a truck driver, but upon further questioning, Trooper Koeberl detected that Moore did not appear to have "a whole great amount of knowledge about contracting." ECF No. 30 at 68:1–17. Trooper Koeberl also stated that it was "basic knowledge" for a truck driver to know to transfer one's commercial driver's license when moving to another state. *Id.*

Trooper Koeberl then returned to his squad car and ran Moore's information through various police databases, including a network of license plate readers. ECF No. 41 at 9. Trooper Koeberl learned that Moore's license plate had been picked up by a license plate reader two hours *east* of Knapp, which was inconsistent with Moore's story that he was driving from Knapp. *Id.* at 9–10. Trooper Koeberl also learned that Moore's vehicle had been seen over the preceding few days in and around Chicago. *Id.* at 10. This research took approximately 15 minutes, the majority of which was spent on hold with the company that manages the license plate reader system or waiting for representatives of that company to find the information that Trooper Koeberl had requested. *Id.* at 9.

Trooper Koeberl returned to Moore's vehicle and asked Moore to step out of the vehicle, which Moore did. *Id.* at 10. Trooper Koeberl gave Moore warnings about his vehicle's excessive tint, suspended objects, and the need to update his license in Minnesota. *Id.* Trooper Koeberl then asked if Moore would agree to discuss his recent travels, and Moore agreed. *Id.* Trooper Koeberl informed Moore about the inconsistencies the license plate readers had revealed about his purported travel from Knapp. *Id.* Trooper Koeberl asked Moore if he had anything illegal in his car, listing specific types of drugs. *Id.* Moore provided a verbal "no" to each drug listed except "methamphetamine," to which Moore only shook his head. *Id.* Trooper Koeberl asked to search Moore's car, which Moore refused. *Id.*

Trooper Koeberl then asked Moore to stand with two other responding troopers while he executed a dog sniff around the vehicle for illegal drugs. *Id.* The dog, named Bolo, completed multiple passes around the outside of Moore's vehicle; on the first two passes, Bolo exhibited no major behavior changes. *Id.* at 10–11. But on subsequent passes, Bolo's breathing intensified around the rear passenger door seal, which Trooper Koeberl described as "alert behavior." *Id.* at 11, 19. Bolo eventually sat and stared at the point where the front and rear passenger doors met, which was a positive indication for the odor of narcotics in that area. *Id.*

Trooper Koeberl returned Bolo to his squad car and informed Moore that he planned to do a more extensive search of the inside of the vehicle. *Id.* at 11. Trooper Koeberl and several other troopers began to search Moore's vehicle and, eventually, after noticing that two laundry detergent containers were lighter than they should have been, Trooper Koeberl

opened them and found what appeared to be bags of illegal drugs hidden inside. *Id.* Moore was arrested, and subsequent testing revealed the substances in the bags to be methamphetamine. *Id.* at 11, 17. After Moore's arrest, law enforcement obtained a warrant to search Moore's apartment, where they found fentanyl and a firearm. *Id.* at 4.

Moore seeks to suppress evidence from those two searches because he alleges that Trooper Koeberl's search of his vehicle violated his Fourth Amendment right to be free from unreasonable searches and seizures and that any evidence found at his apartment should be suppressed as poisonous fruit of that search. *See* ECF Nos. 20, 21. On December 22, 2025, Magistrate Judge Docherty held an evidentiary hearing on the motions, and he solicited post-hearing briefing from the parties, which the United States and Moore provided. *See* ECF Nos. 28, 31, 40.

In a detailed, 42-page R&R, Magistrate Judge Docherty recommended denying both motions to suppress. Magistrate Judge Docherty concluded that Trooper Koeberl's own observations justified the search of Moore's vehicle and, even if they did not, the collective knowledge doctrine justified the search. ECF No. 41 at 15–31. Magistrate Judge Docherty further concluded that because the search of Moore's vehicle did not violate the Fourth Amendment, the resulting search of Moore's apartment did not elicit fruit of the poisonous tree. *Id.* at 31–32. However, Magistrate Judge Docherty concluded that even if evidence from the search of Moore's apartment was fruit of the poisonous tree, the good faith exception to the Fourth Amendment's warrant requirement provided an additional justification for the search of Moore's apartment. *Id.* at 32–35.

## ANALYSIS

### I.      Motion To Suppress – Search of Moore's Vehicle

The Fourth Amendment protects persons "against unreasonable searches and seizures by the government." *United States v. Stephen*, 984 F.3d 625, 629 (8th Cir. 2021) (citation omitted) (emphasis omitted).  A traffic stop constitutes a seizure under the Fourth Amendment.  *United States v. Riley*, 684 F.3d 758, 762 (8th Cir. 2012).  A stop that is lawful at the start still violates the Fourth Amendment "if it lasts longer than necessary to effectuate its mission—to address the traffic violation that warranted the stop and attend to related safety concerns."  *United States v. Navarette*, 996 F.3d 870, 874 (8th Cir. 2021) (citation modified).  Without reasonable suspicion of separate criminal behavior, an officer "may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission."  *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020).  In evaluating reasonable suspicion, a court considers the "totality of the circumstances" and whether there are "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed."  *Riley*, 684 F.3d at 763 (citation omitted).

The traffic stop and eventual search of Moore's vehicle can be broken into four stages: (1) the initial traffic stop; (2) Trooper Koeberl's investigation into Moore's travels; (3) the K-9 sniff outside of Moore's vehicle; and (4) the search of the vehicle.  The Fourth Amendment was not violated at any of these stages.

### a.   Initial Traffic Stop

Because a traffic stop is a seizure under the Fourth Amendment, a traffic stop "must be supported by either reasonable suspicion or probable cause." *Soderman*, 983 F.3d at 374. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (citation omitted). Here, Trooper Koeberl testified that he stopped Moore's vehicle for excessive window tint and suspended objects that blocked the windshield, ECF No. 41 at 9, both of which are traffic violations that provide probable cause for a traffic stop, *see* Minn. Stat. § 169.71, subds. 1, 4.

Moore suggests that Trooper Koeberl did not actually see any suspended objects blocking the windshield because he did not pull up next to Moore's vehicle. ECF No. 44 at 4. Magistrate Judge Docherty rejected this argument, finding credible Trooper Koeberl's testimony that he saw a suspended object blocking the windshield, testimony which was corroborated by Trooper Koeberl's body-worn camera and contemporaneous statements during the traffic stop. ECF No. 41 at 16. The Court agrees with Magistrate Judge Docherty's assessment, but even assuming that Trooper Koeberl did not see a suspended object, Moore does not substantively challenge Trooper Koeberl's determination that Moore's vehicle also had excessive window tint, which independently provides probable cause for a traffic stop. *See United States v. Rose*, 124 F.4th 1101, 1105 (8th Cir. 2025). The initial stop of Moore's vehicle was lawful.

### b.   Trooper Koeberl's Investigation Into Moore's Travels

The next stage of the traffic stop includes the time from Trooper Koeberl's initial interaction with Moore through Trooper Koeberl's research into Moore's travels. A traffic

8

stop must not last "longer than necessary to effectuate its mission." *Navarette*, 996 F.3d at 874. "Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have justification for a greater intrusion unrelated to the traffic offense." *Riley*, 684 F.3d at 763 (citation omitted).

Start with Trooper Koeberl's initial questioning of Moore, which included questions about Moore's identity, license status, and travels. ECF No. 41 at 9, 16–17. This period of questioning is unobjectionable, for a "reasonable investigation during a traffic stop may include asking for the driver's license and registration" and "asking the driver about his destination and purpose." *Riley*, 684 F.3d at 764 (citation omitted) (internal quotation marks omitted). To the extent that Moore challenges Trooper Koeberl's questions about Moore's occupation, *see* Gov't Ex. 4 at 3:32–4:35,[2] these "few questions," which lasted about one minute toward the beginning of the traffic stop and only "briefly extend[ed] the length of the detention," did not violate the Fourth Amendment,[3] *United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009) (citation omitted) (holding as much for four to six minutes of questioning about defendant's occupation and presence of contraband in his

---

[2]    "Gov't Ex." refers to the United States' exhibits submitted at the evidentiary hearing before Magistrate Judge Docherty.

[3]    The questions about Moore's occupation were also arguably justified by Moore presenting an Illinois commercial driver's license despite representing that he lived in Minnesota. *See United States v. Newland*, 246 F. App'x 180, 182, 189 (4th Cir. 2007) (reasonable suspicion created, in part, by defendant furnishing a U.S. Virgin Islands driver's license while claiming to live in Washington, D.C.); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006) (reasonable suspicion created, in part, by defendant furnishing a vehicle registration with a California address while claiming to live in New York).

vehicle); *see also United States v. Puckett*, 139 F.4th 730, 739 (8th Cir. 2025) (holding as much for 20 seconds of unrelated questioning when those questions did not "prolong the stop beyond the time needed to complete the remaining tasks of the traffic stop").

The next question is whether it was lawful for Trooper Koeberl to extend the traffic stop by 15 minutes to research Moore's travels through a network of license plate readers. The parties appear to agree that this delay posed a "greater intrusion unrelated to the traffic offense," so the United States must demonstrate that Trooper Koeberl had "reasonable, articulable suspicion that criminal activity [was] afoot" to justify this greater intrusion. *Riley*, 684 F.3d at 763.

The United States makes that showing. As soon as Trooper Koeberl approached Moore's vehicle, he was accosted by the "overwhelming odor" of laundry detergent, which Trooper Koeberl knew from his experience to be a common masking agent for illegal drugs. ECF No. 41 at 16–17; *see* ECF No. 30 at 69:17–70:18. Trooper Koeberl also saw a "Black Ice" air freshener hanging from the rearview mirror, which he also knew as a common masking agent for illegal drugs. *Id.* Trooper Koeberl also felt it unusual that, although Moore represented that he was contracted as a truck driver, Moore seemed to lack knowledge about contracting and the licensing requirements for a commercial truck driver. ECF No. 30 at 68:1–17. The presence of two common masking agents for illegal drugs, coupled with Moore's evasive answers about his occupation, provide "particularized, objective facts" that "reasonably warrant suspicion that a crime is being committed." *Riley*, 684 F.3d at 763; *see United States v. Pollington*, 98 F.3d 341, 343 (8th Cir. 1996) (finding reasonable suspicion for continued detention of vehicle when officer smelled laundry

10

detergent and the suspect appeared nervous); *United States v. Gonzalez-Carmona*, 35 F.4th 636, 641 (8th Cir. 2022) (finding reasonable suspicion for continued detention of vehicle when officer smelled known masking agent and passengers in the vehicle gave inconsistent and "suspicious" answers to routine questions).

Moore argues that his inability to answer basic questions about his occupation or to demonstrate knowledge of his commercial driver's license was not a crime. ECF No. 44 at 12. But "in making determinations of probable cause and reasonable suspicion, the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *De La Rosa v. White*, 852 F.3d 740, 744 (8th Cir. 2017) (citation omitted) (internal quotation marks omitted). Accordingly, Trooper Koeberl didn't need Moore to commit a crime on the spot to justify continued detention. Rather, all Trooper Koeberl needed was "some minimal, objective justification" for Moore's continued detention. *Riley*, 684 F.3d at 763 (citation omitted). Moore's unusual lack of knowledge of his own purported and highly regulated profession, coupled with the overwhelming odor of two known masking agents, provided Trooper Koeberl with reasonable suspicion to suspect that Moore was engaged in unlawful activity. Trooper Koeberl was therefore entitled to extend the traffic stop by 15 minutes to investigate Moore's travels.

### c. K-9 Sniff

After investigating Moore's travels, Trooper Koeberl returned to Moore's vehicle and gave him warnings about his vehicle's excessive window tint, suspended objects, and the need to update his driver's license in Minnesota. ECF No. 41 at 10. There is nothing

11

objectionable about the time taken to complete this task, as it was "time reasonably required to complete" the traffic stop's "original mission." *Navarette*, 996 F.3d at 874. Next up is the continued conversation between Trooper Koeberl and Moore about Moore's travels and whether he had any contraband in the vehicle. ECF No. 41 at 10. Since Moore consented to this conversation—a fact to which Moore does not object—this conversation also did not violate the Fourth Amendment. *See Puckett*, 139 F.4th at 739–40.

Then came the deployment of Bolo and the K-9 sniff around the exterior of Moore's vehicle, to which Moore did not consent. ECF No. 41 at 10–11. Generally, a police dog sniff of the exterior of a vehicle is not considered a search and requires neither probable cause nor reasonable suspicion for its justification under the Fourth Amendment. *United States v. Pulido-Ayala*, 892 F.3d 315, 318 (8th Cir. 2018). However, the extension of a stop to conduct a dog sniff on a vehicle requires reasonable suspicion of criminal activity beyond the traffic violation originally justifying the stop. *Rodriguez v. United States*, 575 U.S. 348, 358 (2015). So, did Trooper Koeberl have "reasonable, articulable suspicion that criminal activity [was] afoot" when he deployed Bolo? *Riley*, 684 F.3d at 763 (citation omitted).

Yes. Recall the circumstances that Trooper Koeberl previously encountered: he had already detected the presence of two well-known masking agents and found Moore's responses about his occupation suspicious. But by the time Trooper Koeberl deployed Bolo, Trooper Koeberl had two additional facts that heightened his suspicion that criminal activity was afoot. First, Trooper Koeberl learned that Moore's vehicle had been detected two hours east of Knapp, Wisconsin, which contradicted Moore's story that he was

12

traveling from Knapp to the Twin Cities.  ECF No. 41 at 9–10.  Moore's discredited description of his travels "cast[] suspicion and doubt on the nature and legitimacy" of his activities and furnished reasonable suspicion of criminal activity.  *United States v. Jones*, 269 F.3d 919, 928 (8th Cir. 2001).  Second, Trooper Koeberl found it odd that, when asking Moore about whether he had various items of contraband in his vehicle, Moore responded with a verbal "no" to each item *except* methamphetamine, to which Moore only shook his head.  ECF No. 41 at 10.  Trooper Koeberl justifiably points to this unusual and evasive answer as evidence that criminal activity was afoot.  *See United States v. Suitt*, 569 F.3d 867, 872 (8th Cir. 2009) (finding reasonable suspicion when suspect gave "hesitant, evasive, and incomplete answers" to officer's questions), *abrogated on other grounds by Rodriguez*, 575 U.S. at 358.  Overall, then, the presence of two masking agents in Moore's vehicle, Moore's discredited version of his travels, and his unusual answers about his occupation provided reasonable suspicion for Trooper Koeberl to extend the traffic stop to include a K-9 sniff.

### d.    Search Inside Moore's Vehicle

After conducting a K-9 sniff of the exterior of Moore's vehicle, Bolo eventually sat and stared at the point where the front and rear passenger doors met, which was a positive indication for the odor of narcotics in that area.  ECF No. 41 at 11, 19.  A drug detection dog's alert to the presence of drugs in a vehicle establishes probable cause for law enforcement to search that vehicle.  *See United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007).  And once law enforcement has probable cause to believe that a vehicle contains drugs, law enforcement may search every part of the vehicle and its contents,

including "all containers within a car." *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999) (emphasis omitted); *see also Donnelly*, 475 F.3d at 955. So, once Bolo gave a positive indication for drugs in Moore's vehicle, Trooper Koeberl was entitled, consistent with the Fourth Amendment, to search every part of Moore's vehicle, including the laundry detergent containers in which the methamphetamine was found.

To avoid this straightforward conclusion, Moore challenges Bolo's reliability for actual drug finds in the field, arguing that his 54% reliability rate "is not a whole lot better than a coin toss." ECF No. 44 at 6–7. But a "dog is presumptively reliable at detecting illicit drugs—and its alert establishes probable cause for a search—if the dog has satisfactorily completed a bona fide certification or training program." *United States v. Collier*, 116 F.4th 756, 761 (8th Cir. 2024). Bolo possessed such a certification at the time of the search of Moore's vehicle. Gov't Ex. 2. To overcome Bolo's presumptive reliability, Moore must demonstrate "the inadequacy of [the] certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Collier*, 116 F.4th at 761 (citation omitted) (alteration in original). All Moore points to is Bolo's 54% reliability rate, ECF No. 44 at 6, which actually *supports* Bolo's reliability, as "a trained dog's alert will establish probable cause when the dog's previous in-field accuracy rate exceeds 50 percent," *Collier*, 116 F.4th at 761. Nothing in the record undermines Bolo's reliability as a drug detection dog.

Accordingly, from the initial traffic stop to the search of Moore's vehicle, Moore's Fourth Amendment rights were not violated. Moore's motion to suppress evidence resulting from the search of his vehicle is therefore denied.

e.    **Collective Knowledge Doctrine**

Because the Court determines that Trooper Koeberl's own observations justified searching Moore's vehicle, the Court need not address the R&R's alternative holding that the collective knowledge doctrine provided Trooper Koeberl with authority to do so. ECF No. 41 at 22–31. Nevertheless, the Court agrees with the R&R that the collective knowledge doctrine provides an alternative, independent basis to uphold the search.

When officers work together on an investigation, the "collective knowledge" doctrine "impute[s] the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure." *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001). The validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation" if "some degree of communication exists between them." *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). That requirement serves to distinguish between "officers functioning as a search team" and "officers acting as independent actors who merely happen to be investigating the same subject." *Gillette*, 245 F.3d at 1034 (citation omitted) (internal quotation marks omitted).

Here, Investigator Athman's knowledge of Moore's alleged drug distribution activities was imputed to Trooper Koeberl when they met at the Interstate 94 weigh station on the morning of May 8, 2025, to discuss "the overarching investigation, concerns related to the investigation," and the suspicion that Moore was purchasing illegal drugs in Chicago and transporting them to the Twin Cities for eventual distribution in central Minnesota. ECF No. 41 at 7–8. Moore disputes this conclusion by suggesting that Investigator Athman and Trooper Koeberl did not have the requisite "degree of communication" to impute

15

Investigator Athman's knowledge to Trooper Koeberl. ECF No. 41 at 10. But the information shared with Trooper Koeberl at the weigh station goes far beyond the level of communication the Eighth Circuit has found sufficient to apply the collective knowledge doctrine. *See United States v. Robinson*, 664 F.3d 701, 703–04 (8th Cir. 2011) (applying collective knowledge doctrine when one officer simply told another officer to make a traffic stop). Clearly, then, Trooper Koeberl was not some random officer who "merely happen[ed] to be investigating the same subject" as Investigator Athman. *Gillette*, 245 F.3d at 1034.

Moore also suggests that Investigator Athman only had a "hunch" that Moore was transporting drugs from Chicago to the Twin Cities, but that considerably undersells the information that Investigator Athman had learned about Moore. ECF No. 44 at 3. As Magistrate Judge Docherty detailed, a cooperating defendant told Investigator Athman that his source purchased drugs from a supplier in the Twin Cities through roadside and curbside transactions. ECF No. 41 at 5. Investigator Athman then witnessed this source meet with Moore in Minneapolis under circumstances that Investigator Athman, based on his training and experience, found indicative of drug dealing. *Id.* Moore's phone data also showed that he met and was in contact with the source, and Investigator Athman and his colleagues witnessed multiple short-term encounters between Moore and the source in Minneapolis, which Investigator Athman found indicative of drug dealing. *Id.* at 6. Investigator Athman also learned from phone and vehicle tracking data that Moore made multiple trips between the Twin Cities and Chicago in the spring of 2025, during which Moore would drive or fly from the Twin Cities to Chicago and then drive back to the Twin Cities after only a short

16

time in Chicago. *Id.* at 7.  Investigator Athman's investigation into Moore provided him with far more than a "hunch" that Moore was engaged in criminal activity; rather, it provided him with reasonable suspicion that Moore was engaged in drug dealing.

That reasonable suspicion was imputed to Trooper Koeberl on May 8, 2025, and amplified the reasonable suspicion that Trooper Koeberl independently obtained through his own observations during his traffic stop of Moore.  Indeed, armed with Investigator Athman's knowledge of Moore's questionable travels and transactions with a known drug dealing source, Trooper Koeberl could no doubt conclude that drugs were likely to be found in Moore's vehicle when, upon stopping Moore's vehicle, he immediately detected two masking agents in the vehicle.  ECF No. 41 at 16–17; *see* ECF No. 30 at 69:17–70:18.  That permitted Trooper Koeberl to extend the traffic stop and, combined with the circumstances described above, ultimately permitted Trooper Koeberl to search the interior of Moore's vehicle.  So, even if Trooper Koeberl's own observations fell short of establishing probable cause to stop Moore's vehicle, reasonable suspicion to extend the traffic stop, and probable cause to search the vehicle, Investigator Athman's knowledge from his substantial investigation into Moore fills the gap.  Applying or refusing to apply the collective knowledge doctrine therefore leads to the same result: denial of Moore's first motion to suppress.

## II.    Motion To Suppress – Search of Moore's Apartment

Moore's second motion to suppress is related to the search of his apartment on a warrant and the discovery of fentanyl and a firearm there.  ECF No. 21.  As Moore concedes, however, this motion succeeds only if the evidence obtained during the vehicle

17

search is fruit of the poisonous tree. *See* ECF No. 44 at 12–13; *see also* ECF No. 41 at 31. This Court has concluded that the search of Moore's vehicle did not violate the Fourth Amendment, so there is no poisonous fruit to suppress. Accordingly, the Court denies Moore's second motion to suppress.[4] For that reason, the Court need not address Magistrate Judge Docherty's alternative holding that even if the vehicle search was constitutionally infirm, the good faith exception to the Fourth Amendment's warrant requirement provided an additional justification for the search of Moore's apartment.

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The R&R (ECF No. 41) is **ADOPTED**;

2. Moore's Motion to Suppress Evidence Obtained From a Search of His Vehicle (ECF No. 20) is **DENIED**;

3. Moore's Motion to Suppress Evidence Obtained From a Search of His Apartment (ECF No. 21) is **DENIED**; and

4. Moore's Motion for Discovery (ECF No. 22) is **DENIED as moot**.

Dated: June 5, 2026                          *s/Laura M. Provinzino*
                                             Laura M. Provinzino
                                             United States District Judge

---

[4] Before Magistrate Judge Docherty, Moore also argued that the seizure of Ring camera data from Moore's apartment was illegal because the data was not within the scope of the warrant. ECF No. 21 at 2. Magistrate Judge Docherty rejected that argument, *see* ECF No. 41 at 36–38, and Moore does not object to that conclusion. Finding no clear error in Magistrate Judge Docherty's conclusion, the Court adopts it. *See Newton*, 259 F.3d at 966.